# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

04 SEP 28 AM II: 14

U.S.
N D

CHERYL DONALDSON, )
)
    Plaintiff, )
)
vs. )    CV 02-B-3147-NE
)
SOUTHBANK, A FEDERAL SAVINGS )
BANK, )
)
    Defendant. )

**ENTERED**

SEP 2 8 2004

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Partial Summary Judgment, (doc. 23),[1] which asks the court to dismiss plaintiff's claims for monetary damages, and on defendant's Motion for Summary Judgment, (doc. 26), which asks the court to dismiss all of plaintiff's claims. Plaintiff Cheryl Donaldson has sued her former employer, defendant SOUTHBank, alleging that, in violation of federal law, defendant discriminated against her on the basis of her race, African-American. Plaintiff also alleges state-law causes of action for negligent training, supervision, and retention. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Partial Summary Judgment, (doc. 23), is due to be granted, and defendant's Motion for Summary Judgment, (doc. 26), is due to be granted in part and denied in part.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

*38*

## I. **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>[2]

Defendant SOUTHBank hired plaintiff Cheryl Donaldson, African-American, on February 28, 2000, as a part-time employee at its downtown Huntsville branch. (Doc. 27, Ex. 6 ¶ 4; doc. 29, Ex. 11 at 2.) Her duties included: opening the night deposit box, providing customer services, opening new accounts, processing loan payments, and covering the switchboard and the drive-thru window during lunch. (Doc. 29, Ex. 1 at 52, 61, 65, 68; *see also* doc. 29, Ex. 8 ¶ 5.)

In November 2001, defendant hired Kimberly Russell, white, as Branch Manager for the Downtown Branch. (Doc. 27, Ex. 6 ¶ 6.) Thereafter, Russell hired Karen Cooper, white, as Assistant Branch Manager. (*Id.*, Ex. 2 at 36, doc. 29, Ex. 1 at 109, 133.)

After these changes in branch management, plaintiff contends she spent less time at the switchboard and the drive-through teller window and more time working in the main lobby. (Doc. 27, Ex. 1 at 110-11.)[3] Jane Tidmore, white, was assigned plaintiff's duties of relieving the switchboard operator and the drive-thru teller during lunch. (*See* doc. 29, Ex. 1 at 109,110; *id.*, Ex. 9 ¶ 11.) Two other white employees, Becky Merrill and Pam Ray assumed plaintiff's duty of opening the night drop box. (*Id.*, Ex. 1 at 55-56, 109.)

---

[2]For purposes of summary judgment, all facts and reasonable inferences therefrom are drawn in favor of the plaintiff.

[3]Plaintiff did work the drive-thru on March 26, 2002, March 28, 2002, May 17, 2002, and May 20, 2002. (Doc. 29, Ex. 1 at 218-19, 222.)

Russell and Cooper testified that they considered plaintiff difficult to work with and reluctant to perform additional tasks assigned to her. (*See* doc. 27, Ex. 2 at 52; *id.*, Ex. 3 at 70.)[4] Russell testified that she believed that plaintiff was not giving 100% effort to her job, unlike other branch employees, and did not want to give 100%. (Doc. 57, Ex. 2 at 58.) She believed that plaintiff was often "roaming" around the bank and she was told that plaintiff was often on the telephone in "long drawn out calls." (*Id.* at 58, 60, 76-77.) Anne Troutman, defendant's Human Resources Manager, told Russell that she had received complaints that plaintiff was roaming and taking personal calls at work. (*Id.* at 80-81.) Plaintiff denies that she used the telephone for personal calls and contends that, although she was on the telephone more than other tellers, it was strictly business use. (Doc. 29, Ex. 1 at 249.)

Plaintiff worked at defendant's Madison Branch for nine days in March and April 2002. (Doc. 29, Ex. 10.) Kathy Cribbs, Branch Manager of defendant's Madison branch, told Russell that she did not want plaintiff back at her branch to work relief, and that she

---

[4]Russell testified:

[Plaintiff] had been there a year and a half before I came. I'm not sure why her skills were not what they were because I didn't train her. . . .

  . . .

She needed – she was very uncomfortable and I don't know why because she had been there a year and a half. I had tellers that came from Compass and other banks that started and a month later were perfectly fine. But she was very upset, very angry. [Plaintiff] was very angry, very upset, I think . . . .

(Doc. 27, Ex. 2 at 52.)

4

would rather work "short," without a full staff. (Doc. 27, Ex. 2 at 110-12.) Russell testified, "Kathy needed somebody that was willing to be more cooperative. And Kathy . . . just didn't want her[.] [S]he said she'd work short before she had Cheryl back out there." (*Id*. at 111-12.)

When plaintiff returned to the Downtown Branch after working in Madison, her things had been removed from her desk and placed in a cabinet behind the desk. (Doc. 29, Ex. 1 at 123-24.) Before plaintiff went to the Madison Branch, she had been told that Merrill, a full-time customer service employee, was going to have her desk. (*Id*. at 124 -25.) When Merrill left shortly thereafter, plaintiff's original desk was assigned to Pam Dunlap, another full-time customer service employee. (*Id*. at 128.)

Prior to Russell's hiring, plaintiff had attended a customer service seminar. (Doc. 29, Ex. 5.) Also, plaintiff had begun training on the ATM. (Doc. 29, Ex. 1 at 151-52.) Plaintiff contends that Russell discontinued her ATM training before it was complete and that Russell reassigned Cooper and Ray to this training. (Doc. 29, Ex. 1 at 152-53, 155.) Plaintiff had received two weeks of training on the ATM machine before defendant hired Russell. (*Id*. at 153.)[5] None of the newly hired employees, including Ray and Cooper, knew how to service the ATM machine when they were hired. (*Id*. at 156.) Nevertheless, plaintiff testified that

---

[5]Plaintiff testified that servicing the ATM consisted of opening the machine, removing the money, counting the money with a money counter, putting the money back in the machine, closing the machine, and some paperwork. (Doc. 29, Ex. 1 at 153, 159.) Plaintiff's training consisted of actually servicing the ATM for about two weeks with her former assistant manager, Vanessa Boddie. (*Id*. at 159.) Plaintiff testified that after two weeks, she still did not feel like she could service the ATM. (*Id*. at 155.)

she considered it unreasonable to give these new employees training before providing more for her. (*Id.*) However, she did not complain to Russell about the discontinuation of her ATM training. (*Id.* at 160.)

Plaintiff contends that she was excluded from a training class held on February 12, 2002. (*Id.* at 137.) Russell tried to submit plaintiff's information the day before the class, but it was too late. (*Id.* at 135-36.) Plaintiff was unable to attend because the class was full.

On February 13, 2002, training was held at the Downtown Branch on IRA accounts. (*Id.* at 138.) Russell had told all of the main lobby customer service representatives except plaintiff about this training. (*Id.* at 138.) Plaintiff was the customer service representative not told of the training in advance, and she contends she had no choice but to remain in the lobby while the others attended the training session. (*Id.* at 138-39.) She testified she had chosen to stay in the lobby because she did not think that the lobby should be left unattended. (*Id.* at 139.)

Russell scheduled Cooper and Ray to attend a training session in Florida in March 2002. (*Id.* at 143.) Plaintiff was scheduled to have stomach surgery at the end of February and would be out of work until sometime in March. (*Id.* at 146.) Russell asked her to reschedule her surgery to accommodate the rest of the staff attending this seminar, to which plaintiff agreed. (*Id.* at 143-44.)

A computer training class was scheduled to take place in Decatur, Alabama on March 18, 2002; plaintiff asked Cooper to attend. (*Id.* at 149.) Cooper told plaintiff that she could go. (*Id.* at 149.) Plaintiff testified that Cooper told her she would get back with her

regarding information concerning the class, but Cooper never did. (*Id.* at 150-51.) Plaintiff did not follow up with Cooper, and she does not know if the class ever met. (*Id.*)

At the time of her termination, defendant paid plaintiff $8.60 per hour. (Doc. 29, Ex. 7.) White employees, Jane Tidmore and Pamela Ray were paid more than plaintiff; defendant paid Ray $9.00 per hour and it paid Tidmore $10.00 (Doc. 29, Ex. 9 at ¶ 12.) Russell testified that plaintiff did not get a raise in 2002 because Russell did not feel that she could justify a performance increase based on plaintiff's performance rating. (Doc. 27, Ex. 2 at 151.)

On Friday, May 17, 2002, Pamela Dunlap reported to Cooper that plaintiff had said "she might not come to work because she didn't want to work the drive-through." (Doc. 27, Ex. 5.) Cooper reported the comment to Russell. (*Id.*, Ex. 3 at 84.) Plaintiff denies making the statement. (Doc. 29, Ex. 1 at 221-22.),

The following Monday, after talking with Dunlap and another employee regarding the events of Friday, May 17th, Russell decided to terminate plaintiff because of plaintiff's "attitude problems." (Doc. 29, Ex. 2 at 118-19.) Russell testified that plaintiff's comments in the lobby on Friday had been "the icing on the cake." (*Id.* at 119-20.) Russell stated that on the morning of May 20, 2002, she "had made up [her] mind that [she] just needed to let [plaintiff] go because [she] didn't see [plaintiff] improving at all as far as her disposition and her attitude toward everybody." (Doc. 27, Ex. 2 at 105-06.) She said, "[Y]ou can't have an employee stand in the lobby and tell [her] supervisor [she] may or may not be back." (*Id.* at 56).

7

In a memo date May 20, 2002, Russell detailed her decision to terminate plaintiff; she wrote:

> From the beginning of my employment with SOUTHBank, I have made it a priority to build a "team" concept with employees that were willing to work hard and be dedicated to improving the bank and that would maintain a positive, upbeat attitude.

> From the beginning, I had witnessed many negative confrontations and remarks between [plaintiff] and Pat Mulligan, the Head Teller. [Plaintiff] was never at her desk and on many occasions, I would inquire about her location and Pat would tell me she did not know [plaintiff's] whereabouts. I would go in search [of] her and would find her downstairs talking to Vannessa Boddie, her former manager[,] or down in the drive-thru area.

> Prior to Pat Mulligan's dismissal on January 29th, I had talked with [plaintiff] about the volatile relationship she and Pat had, I had told her that I wanted her to stay in the lobby as much as possible and to please inform Pat when she would be up from her desk running bank errands or attending to personal matters. I also mentioned to her that employees had complained of her excessive personal phone calls and to please limit the time she spent on the phone with family or friends.

> On January 28, I had inquired about [plaintiff's] whereabouts and was told by Pat[,] again, she did not know where [plaintiff] was. After locating [plaintiff] "again", Pat and [plaintiff] started arguing in the bank lobby and [plaintiff] informed me that "she was not going to put up with Pat telling lies on her" and that she was being "setup" by Pat to look bad. Pat had previously had problems with other employees, as well as her former manager, and after discussing the situation with Pat, she was terminated as an employee of the bank.

> After Pat's termination, I stressed to [plaintiff] again the importance of staying at her desk and also staying off the phone. During this timeframe, I hired an experienced banker as the assistant manager of the branch and to supervise the teller and platform areas. When Karen Cooper arrived, I told her that the branch needed a lot of organization and that the employees needed training. The branch had not been adequately managed for a number of years and needed a lot of "cleaning up", with respect to branch files, logs, customer

8

files, vault room storage, report files, audit work, etc. We immediately [began] to work on these areas.

During this "cleaning" process, [plaintiff] had been asked by Karen Cooper to help clean up the vault with her. [Plaintiff] was not happy about this request and was noticeably upset over having to go "the extra mile" and actually perform duties others were also performing. [Plaintiff] was overheard one day by Vice President, Read Crawford, in the copier room on the phone with her husband complaining about her job and threatening to leave.

I had also received complaints from personnel on [plaintiff's] time spent on personal phone calls, again. Karen Cooper and myself [met] with [plaintiff] and informed her she "could not" have lengthy personal phone calls at the bank. This was beginning to become an old issue[;] she had been warned about the problem in the past.

Anytime [plaintiff] was asked to help with a project, she acted as if she was being mistreated. She wasn't asked to do anything anyone else wasn't being asked to do. Her bad attitude was apparent to everyone that worked with her.

On May 17, 2002, Karen Cooper told [plaintiff] that we needed her running the drive-thru the next week due to staff training. [Plaintiff] was very upset that she was being asked to do this and left at 2 p.m. stating "that she may not be back on Monday." This statement was overheard by many lobby employees and was not taken as a joke. Karen informed me of this incident on Monday, May 20, 2002 and after careful examination, I could not let the "team" we had worked hard to establish be jeopardized by Cheryl's work ethics.

[Plaintiff] repeatedly ignored management's request to help with various tasks . . . . [Eventually] Mrs. Cooper quit asking [plaintiff] to help with anything.

Karen and I met with [plaintiff] at 2 p.m. on Monday, May 20, and informed her [that her] employment was being terminated due to her negative attitude toward the . . . management. . . .

[Plaintiff] has caused problems in the past for other bank officers. I could not allow her to continue to cause problems and effect other employees.

9

(Doc. 29, Ex. 6 at 2.) During discovery, defendant stated that it had plaintiff was terminated plaintiff for "poor job performance and insubordination." (Doc. 29, Ex. 8 ¶ 4.)

Plaintiff testified that she never heard a racial slur or "anything that [she] thought was offensive from a racial point of view." (Doc. 29, Ex. 1 at 272.)

On June 6, 2002, plaintiff and her husband filed a voluntary petition for bankruptcy under Chapter 13. (Doc. 24, Ex. 2.) Plaintiff did not include her claims of discrimination against defendant as an asset on Schedule B of her bankruptcy filing. (*See id.*, Ex. 3, Schedule B.) On July 19, 2002, plaintiff filed a Charge of Discrimination with the EEOC. (*Id.*, Ex. 1.)

On September 30, 2002, the EEOC issued its Dismissal and Notice of Rights as to plaintiff's EEOC charge, which stated:

> THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:
>
> . . .
>
> [X]   The EEOC issues the following determination:   Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

(*Id.*, Ex. 6.) Plaintiff filed the instant action against defendant on December 23, 2002. (Doc. 1.)

On January 6, 2003, plaintiff's Chapter 13 plan was confirmed.  (Doc. 24, Ex. 7.) Prior to the confirmation of the plan, plaintiff did not amend her Schedule B to reflect her claims against defendant as an asset.

During discovery in the instant action, defendant asked plaintiff, via an interrogatory, whether she had ever filed for bankruptcy.  (*Id.*, Ex. 10 ¶ 19.)  On August 29, 2003, plaintiff responded to the interrogatory, stating that she had filed for bankruptcy.  (*Id.*, Ex. 11 ¶ 19.) On the same day, plaintiff submitted an amended Schedule B, which listed her claims against defendant as an asset worth approximately $600,000.  (*Id.*, Ex. 12.)

### III. DISCUSSION

### A. MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 23)

Defendant contends that plaintiff's "failure to disclose her lawsuit against [defendant] to the bankruptcy court prior to its confirmation of her Chapter 13 plan on January 6, 2003, prohibits her from asserting claims for monetary damages against [defendant] in the present action."  (Def. Br. in Supp. of Mot. for Partial Summ. J. at 3.)  In support of its argument, defendant cites the court to two Eleventh Circuit decisions, *DeLeon v. ComCar Industries, Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003), and *Burnes v. Pemo Aeroplex, Inc.*, 291 F.3d 1282, 1285-86 (11th Cir. 2002).  Both decisions applied the doctrine of judicial estoppel to bar plaintiffs' claims for monetary damages because such claims were not disclosed on plaintiffs' bankruptcy petitions.

"Judicial estoppel is an equitable doctrine that precludes a party from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous

proceeding.'" *Barger v. City of Cartersville, Georgia*, 348 F.3d 1289, 1293 (11th Cir. 2003).

In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the United States Supreme Court listed

three, non-exclusive factors for a court to consider when deciding whether to apply the

doctrine of judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier
> position. Second, courts regularly inquire whether the party has succeeded in
> persuading a court to accept that party's earlier position, so that judicial
> acceptance of an inconsistent position in a later proceeding would create the
> perception that either the first or the second court was misled. Absent success
> in a prior proceeding, a party's later inconsistent position introduces no risk of
> inconsistent court determinations, and thus poses little threat to judicial
> integrity. A third consideration is whether the party seeking to assert an
> inconsistent position would derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped.
>
> In enumerating these factors, we do not establish inflexible
> prerequisites or an exhaustive formula for determining the applicability of
> judicial estoppel. Additional considerations may inform the doctrine's
> application in specific factual contexts.

*New Hampshire*, 532 U.S. at 750-51(internal quotations and citations omitted).

Plaintiff does not dispute that she failed to reveal her claims against defendant, which

arose before she filed her bankruptcy petition, as a potential asset. She argues, however, that

"[d]efendant's motion for partial summary judgment based upon the bankruptcy filing of

[plaintiff] is due to be denied in its entirety" for two reasons – the prior cases are

distinguishable on their facts and the Eleventh Circuit decisions "exceed the underpinnings

of the circuit cases and the Supreme Court decisions [the court] relies on for precedent." (Pl.

Br. in Opp. to Mot. for Partial Summ. J. at 1.)

### 1. Eleventh Circuit Decisions are Binding on this Court

"A circuit court's decision binds the district courts sitting within its jurisdiction while a decision by the Supreme Court binds all circuit and district courts." *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004). This court may not correct a decision of the Eleventh Circuit. *See Jaffree v. Wallace*, 705 F.2d 1526, 1533 (11th Cir. 1983), *aff'd* 472 U.S. 38 (1985). Therefore, even this court believed that the Eleventh Circuit "exceed[ed] the underpinnings of the circuit cases and Supreme Court decisions" as plaintiff contends, this court may not correct those decisions. Rather this court is required to be obedient to the Eleventh Circuit's decisions, as such decisions bind this court.

### 2. Alleged Factual Distinctions

Plaintiff contends that her situation is distinguishable from situations of the plaintiffs in *Burnes* and *De Leon* because (1) her Chapter 13 bankruptcy case is still pending and has not been converted to a Chapter 7 case; (2) "the existence of [the instant] lawsuit has been disclosed to [her] creditors and to the [bankruptcy] court; and (3) she did not have "knowledge" that her claims against defendant were an asset before she filed this lawsuit because the EEOC "did not find evidence that any violation of the statutes had occurred." (Pl. Br. in Opp. to Mot. for Partial Summ. J. at 5.) The court finds these arguments without merit in light of binding precedent.

13

### a. Chapter 13 Case

The Eleventh Circuit in *De Leon* held –

> [Plaintiff] attempts to distinguish *Burnes* because that case involved a debtor
> who filed for bankruptcy under Chapter 7, which allows for the complete
> discharge of debts. [Plaintiff] filed for bankruptcy under Chapter 13 through
> which his debts would be discounted and repaid. However, a financial motive
> to secret assets exists under Chapter 13 as well as under Chapter 7 because the
> hiding of assets affects the amount to be discounted and repaid. *Burnes* made
> no distinction based on the type of bankruptcy at issue. We also conclude that
> any distinction between the types of bankruptcies available is not sufficient
> enough to affect the applicability of judicial estoppel because the need for
> complete and honest disclosure exists in all types of bankruptcies.
> Accordingly, *we hold that the rule established in Burnes, that judicial*
> *estoppel bars a plaintiff from asserting claims previously undisclosed to the*
> *bankruptcy court where the plaintiff both knew about the undisclosed claims*
> *and had a motive to conceal them from the bankruptcy court, applies equally*
> *in Chapter 13 bankruptcy cases.*

*De Leon*, 321 F.3d at 1291 (footnote omitted and emphasis added).

The Eleventh Circuit has clearly and unequivocally held that the type of bankruptcy

petition filed does not affect the application of the doctrine of judicial estoppel. Therefore,

the fact that plaintiff continues to pay on her Chapter 13 plan, and she has not converted it

to a Chapter 7 bankruptcy, does not distinguish her circumstances from the circumstances

in the *Burnes* and *De Leon* decisions.[6]

---

[6]To the extent that plaintiff bases her argument on the fact that her bankruptcy is still
open and that she continues to make payments, the court notes that the plaintiff in *De Leon*
was in the same position when he tried to reopen his bankruptcy estate. *See De Leon*, 321
F.3d at 1291.

**b. Existence of Potential Claims Against Defendant Have Been Disclosed**

On July 10, 2003, defendant served plaintiff with interrogatories asking her if she had ever filed a petition for bankruptcy. (Doc. 24, Ex. 10.) In her response, dated August 29, 2003, plaintiff admitted that she had filed a bankruptcy petition. (*Id.*, Ex. 11.) On the same day, she filed an amendment to her bankruptcy petition, adding the instant action as an asset in her estate, with a current market value of $600,000. (*Id.*, Ex. 12.) Plaintiff did not attempt to disclose her claims against defendant as a potential asset at any time prior to filing her amendment. (*Id.*, Ex. 13 at 274.)

Plaintiff's belated amendment, however, does not save her claims in light of clear Eleventh Circuit precedent. "[T]the Eleventh Circuit expresses no tolerance for parties withholding for strategic purposes claims of which they are aware. The court will not approve of or permit a debtor to 're-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, [for to do so] suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.'" *In re Baldwin*, 307 B.R. 251, 264 (M.D. Ala. 2004)(quoting *Burnes*, 291 F.3d at 1288 (11th Cir. 2002)). In *De Leon*, the Eleventh Circuit held:

> [Plaintiff] also argues that his effort to reopen his bankruptcy estate is evidence that his omission was inadvertent. *But see Burnes*, 291 F.3d at 1287 (explaining that "'the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment'")(quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 999)). While Chapter 13 does allow amendments to be made to add after-acquired assets and Chapter 7 does not, [plaintiff] did not make such an amendment even after he filed suit. Despite [plaintiff's] continuing duty to disclose all assets or potential assets to

15

the bankruptcy court, he did not amend his bankruptcy documents to add a potential employment discrimination claim until after [defendant] relied on it in its motion to dismiss the case.

> The success of our bankruptcy laws requires a debtor's full honest disclosure. Allowing [plaintiff] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.

*Burnes*, 291 F.3d at 1288.

> Because [plaintiff] certainly knew about his claim and possessed a motive to conceal it because his amount of repayment would be less, we can infer from the record his intent "to make a mockery of the judicial system." *Id*. at 1285- 87.

*De Leon*, 321 F.3d at 1291-92; *see also Barger*, 348 F.3d at 1297.[7]

In this case, plaintiff only amended her Schedule B after defendant asked her if she

had ever filed for bankruptcy. Like the plaintiffs in *Burnes*, *De Leon* and *Barger*, plaintiff

disclosed her potential claims against defendant in her bankruptcy proceedings only after

---

[7]The *Barger* court held:

> Finally, [plaintiff's] attempt to reopen the bankruptcy estate to include her discrimination claim hardly casts her in the good light she would like. She only sought to reopen the bankruptcy estate after the defendants moved the district court to enter summary judgment against her on judicial estoppel grounds. Allowing a debtor to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by his adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the Bankruptcy Court with a truthful disclosure of the debtor's assets. As such, [plaintiff's] disclosure upon re-opening the bankruptcy estate deserves no favor.

*Barger*, 348 F.3d at 1297 (internal quotations and citations omitted).

16

defendant "caught [her] concealing them." *See Barger*, 348 F.3d at 1297.   Therefore,

plaintiff's belated disclosure in response to defendant's interrogatory does not "deserve[ ] .

. . favor." *Id.*

### c. Knowledge of Potential Asset

Plaintiff argues –

> It should be noted that the Dismissal and Notice of Rights which Ms.
> Donaldson received from the U.S. Equal Employment Opportunity
> Commission, specifically included the following language: "[T]he EEOC
> issues the following determination: Based upon its investigation, the EEOC
> is unable to conclude that the information obtained establishes violations of the
> statutes."[8]   The agency charged with investigating her claim specifically
> informed Ms. Donaldson that it did not find evidence that any violation of the
> statutes had occurred.   Therefore, it is arguable whether there could be
> considered to be any knowledge of an asset at the EEOC stage at any time
> prior to the filing of her lawsuit in December.

(Pl. Brief in Opp. to Mot. for Partial Summ. J. at 4-5 (internal citations omitted; footnote

added).)  This argument misapprehends the bankruptcy disclosure requirements.

"It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy

debtors an express, affirmative duty to disclose all assets, ***including contingent and***

***unliquidated claims***." *In re Coastal Plains, Inc.*, 179 F.3d 197, 207-08 (5th Cir.

1999)(emphasis added), *cert. denied sub nom., Mims v. Browning*, 528 U.S. 1117 (2000).

"The debtor need not know all the facts or even the legal basis for the cause of action; rather,

if the debtor has enough information . . . prior to confirmation to suggest that it may have a

---

[8]The EEOC Notice of Rights states also, "This does not certify that the respondent is
in compliance with the statutes.   No finding is made as to any other issues that might be
construed as having been raised by this charge."   (Doc. 24, Ex. 6.)

possible cause of action, then that is a known cause of action such that it must be disclosed."
*Id.* (internal citations and quotations omitted; emphasis added); *see also Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001).[9]

On July 18, 2002, plaintiff filed a Charge of Discrimination with the EEOC. (Doc. 24, Ex. 1.) In her Charge, she alleged that defendant had discriminated against her because of her race and her color between February 2, 2002 and May 20, 2002. These are the same claims that she asserts in the instant action; therefore, the court finds that plaintiff, as least as of July 18, 2002, had enough information of her "possible" action against defendant to require that she disclose the potential cause of action on her bankruptcy schedule as an asset. The EEOC's Dismissal and Notice of Rights did not somehow deprive plaintiff of her personal knowledge and information regarding her discrimination claims she had at the time she filed her EEOC charge. The court holds that plaintiff was aware of sufficient information to suggest that she may have had a claim against defendant based on its pre-petition conduct

---

[9]The *Hamilton* court found that plaintiff knew of his claims against defendant before he filed his bankruptcy petition; it held:

> Hamilton knew of all the material facts surrounding the damage to the house and State Farm's investigation and denial of his claim at the time he filed his bankruptcy schedules and for many months before pursuing legal action. Hamilton's knowledge that a cause of action against State Farm existed at the time he filed for bankruptcy and completed his bankruptcy schedules and disclosure statements is clearly evidenced by the letters that his lawyers wrote to State Farm on August 4, 1997 and October 16, 1997, both of which contained threats of litigation.

*Hamilton*, 270 F.3d at 785.

at least as early as July 18, 2002. Therefore, plaintiff was required to disclose her claims against defendant in her bankruptcy filings prior to confirmation of the plan.

Based on the foregoing, the court finds that the doctrine of judicial estoppel bars plaintiff from pursuing claims for monetary damages. Therefore, defendant's Motion for Partial Summary Judgment is due to be granted and plaintiff's claims for monetary damages are due to be dismissed.

## B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 26.)

### 1. Federal Claims

In her Second Amended Complaint, plaintiff alleges that defendant discriminated against her on the basis of her race and color in violation of Title VII and § 1981, with regard to training, work environment, pay, and termination. (Doc. 10.) Plaintiff has not presented any direct evidence of race discrimination; therefore, the court will "use the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

> Under this framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.

*Id.* (citing *McDonnell Douglas*, 411 U.S. at 802; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997))(internal citations omitted).

### a. Job Assignment

In her brief, plaintiff contends defendant "stripped [her] of her duties as a relief drive-thru teller, [took away] her key combination . . ., [took away] her cash drawer . . ., [took away] her desk . . ., [pushed her] to the back, out of sight of customers, and told [her] to clean the vault." (Pl. Br. in Opp. to Mot. for Summ. J. at 14.)  She testified that after she returned from the Madison branch she asked Cooper, "What am I supposed to be doing?," and Cooper told her to do the filing and clean out the vault.  (Doc. 29, Ex. 1 at 125-26.)

The Eleventh Circuit has held that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.  Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001)(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)).  Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Id.* "In the vast majority of instances, however, we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the

protection afforded by Congress in Title VII's anti-discrimination clause – especially where . . . the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification." *Id.* at 1245 (citations omitted).

Plaintiff has offered no evidence that the changes in her work assignments resulted in "any tangible harm." She testified that neither her pay nor her hours were decreased. (Doc. 29, Ex. 1 at 280.) Therefore, despite plaintiff's contention that she found the situation demeaning, the court finds insufficient evidence that the alleged changes in plaintiff's work assignments constitute an adverse employment action.

Defendant's Motion for Summary Judgment is due to be granted as to plaintiff's claims based on changes in her job assignments, and such claims are due to be dismissed.

### b. Training

As set forth above, plaintiff must establish that she "was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson*, 376 F.3d at 1087. With regard to her claims that she was denied training opportunities, plaintiff has failed to show that defendant acted intentionally to deny her these opportunities and/or that the training opportunities were "materially related to the employee's job responsibilities or possibilities for advancement," *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 n.16 (11th Cir.)(citations omitted), *cert. denied* 525 U.S. 962 (1998), and, therefore, the denial of such training opportunities is not actionable.

In her Second Amended Complaint, plaintiff contends that she "was repeatedly denied crucial training opportunities." (Doc. 10 ¶ 8.) As a preliminary matter, in order to

demonstrate an actionable claim for discriminatory non-selection for training, plaintiff must "demonstrate[ ] that [her] non-selection adversely affected the terms or conditions of [her] employment." *Bullock v. Widnall*, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996)(citing *Wu v. Thomas*, 996 F.2d 271, 274 (11th Cir. 1993)), *aff'd*, 149 F.3d 1196 (11th Cir. 1998). Also, as with all discrimination claims, plaintiff must prove intentional discrimination and to do so, she "must prove that the discriminatory practice was not accidental, inadvertent, or heedless, or that it arises from a mistake." *Woods v. Ficker*, 768 F. Supp. 793, 803 (N.D. Ala. 1991)(quoting *Bradington v. I.B.M. Corp.*, 360 F. Supp. 845 (D.C. M.D. 1973), *aff'd* 492 F.2d 1240 (4th Cir. 1974)), *aff'd* 972 F.2d 1350 (11th Cir. 1992).

Plaintiff claims defendant denied her six training opportunities – (1) Revitalizing Customer Service class, February 8, 2002, (doc. 10 ¶ 8); (2) a customer service training seminar regarding the computer system, February 12, 2002, (*id*); (3) IRA seminar, February 13, 2002, (*id.* ¶ 9); (4) computer training in Florida, March 2002, (*id.* ¶ 10); (5) computer training on March 18, 2002; and (6) additional ATM training.

The record indicates that plaintiff had received the customer service training in 2001. Also, the record indicates that she had received two weeks of training on the ATM machine, before she alleges Russell removed her name from the training list. Nothing in the record indicates that plaintiff's failure to receive additional training on the ATM machine or duplicative training in Revitalizing Customer Service adversely affected plaintiff's "job responsibilities or possibilities for advancement." *Turlington*, 135 F.3d at 1436 n.16.

With regard to the computer training on February 12, 2002 and March 18, 2002, as well as the IRA seminar, plaintiff has failed to present any evidence that defendant deliberately denied her the opportunity to attend these training sessions. With regard to the February 12th and March 18th computer training sessions, defendant approved plaintiff's attendance. Nothing in the record indicates that her failure to actually attend these sessions was the result of a deliberate action or decision of defendant, as opposed to an oversight or a mistake. With regard to the IRA seminar, which was held at the branch, plaintiff testified that no one told her that she could not attend; rather, she testified, "I couldn't [go to the IRA training session] because you couldn't leave the lobby unsecured with no one in there." (Doc. 29, Ex. 1 at 138-39.

In addition to failing to show that defendant intentionally denied her these training opportunities, plaintiff has not shown that the computer training on February 12 and March 18, and the IRA training, were materially related to her job responsibilities or possibilities for advancement.

The final training opportunity that plaintiff claims she was denied was the computer training that took place in Florida in March of 2002. However, plaintiff testified that she was scheduled for surgery at the time of this training. Also, she has not presented any evidence that this training was materially related to her job responsibilities or possibilities for advancement.

Based on the foregoing, the court finds that plaintiff has failed to present sufficient evidence to show that these denials of training opportunties were actionable adverse

employment decisions. Therefore, summary judgment is due to be granted and plaintiff's discriminatory training claims are due to be dismissed.

### c. Termination

Defendant contends that plaintiff cannot establish that its articulated reason for her termination was a pretext for racial discrimination.[10] Defendant has articulated two reasons for plaintiff's termination – "poor job performance and insubordination." (Doc. 27, Ex. 6 ¶ 7; doc. 29, Ex. 8 ¶ 4.) Plaintiff contends that these reasons are a pretext for race discrimination because (1) the decisionmaker's testimony as to her reasons for terminating plaintiff are inconsistent with defendant's articulated reasons, and (2) plaintiff denies having an attitude problem.

Defendant contends that it terminated plaintiff for poor work performance and insubordination. The decisionmaker, Russell, testified that she terminated plaintiff because of plaintiff's "attitude problems." Contemporaneous with plaintiff's termination, Russell prepared "a detailed summary surrounding the termination of employment between SOUTHBank and part-time teller, Cheryl Donaldson." (Doc. 29, Ex. 6 at 1.) In this summary, Russell stated:

> On May 17, 2002, Karen Cooper told Cheryl that we needed her running the drive-thru the next week due to staff training. Cheryl was very upset that she was being asked to do this and left at 2 p.m. stating "that she may not be back

---

[10]Defendant does not challenge plaintiff's termination claim on the ground that she cannot establish a prima facie case. Therefore, the court assumes, for purposes of deciding defendant's Motion for Summary Judgment, that plaintiff can establish a prima case of race discrimination with regard to her termination.

on Monday." This statement was overheard by many lobby employees and was taken as a joke. Karen informed me of this incident on Monday, May 20, 2002 and after careful examination, I could not let the "team" we had worked hard to establish be jeopardized by Cheryl's work ethics.

. . .

Karen and I met with [plaintiff] . . . on Monday, May 20, and informed her [that her] employment was being terminated due to her negative attitude toward the . . . management.

(Doc. 29, Ex. 6 at 2 (footnote supplied).) In this memorandum, Russell notes that plaintiff had been cautioned regarding "the importance of staying at her desk and also staying off the phone." (*Id.* at 1.) She also noted, "Anytime Cheryl was asked to help with a project, she acted as if she was being mistreated. She wasn't asked to do anything anyone else wasn't being asked to do. Her bad attitude was apparent to everyone that worked with her." (*Id.* at 2.) Russell did not specifically testify that she terminated plaintiff for "poor job performance and insubordination." However, the court does not find that defendant's articulated reason – insubordination and performance problems – to be so inconsistent with Russell's testimony that she fired plaintiff because of her "poor attitude" as to allow a reasonable jury to infer that defendant's articulated reasons are not worthy of credence. *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)("A company may have several legitimate reasons to dismiss an employee. But when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.") (citations omitted). The court finds that insubordination and performance problems are consistent with Russell's description of plaintiff's alleged "bad attitude."

25

Nevertheless, for purposes of deciding defendant's Motion for Summary Judgment, the court finds that defendant's precise reason for plaintiff's termination was Russell's determination that plaintiff had attitude problems.

As evidence that Russell's articulated reason for her termination is unworthy of credence, plaintiff contends she did not have any attitude problem; she testified that she did not make the May 17th statement at issue, and that "she did all that was asked of her without complaining." (Pl. Mem. in Opp. to Mot. for Summ. J. at 16-17.)  However, in order to establish that a defendant's articulated reason is not worthy of credence –

> "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]." [*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)].  The role of this Court "is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments." *Id.* at 1254.  "Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." [*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)].  Whether [plaintiff actually had a bad attitude] is not an issue for this Court to referee."

*Wilson*, 376 F.3d at 1092.

The undisputed evidence indicates that Russell's perception of plaintiff's attitude problems, including her knowledge of the alleged May 17th statement, were based on reports from other employees.  Therefore, plaintiff cannot establish pretext merely by proving that she did not have an attitude problem.

As the Middle District of Alabama has explained –

As the *Damon* court explained, however, an employer who fires an employee under the mistaken but honest impression that the employee violated a work

26

rule is not liable for discriminatory conduct. [*Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999)].

> . . . [T]he general rule is that a plaintiff must do more than point to contradictory evidence that shows an employer may have been mistaken in its belief that the plaintiff committed the alleged infractions. *See Strickland*, 108 F. Supp. 2d at 1333; *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Therefore, where a decision maker relies on another's report that the plaintiff committed the work rule violation in question and fires him on that basis, the plaintiff is unable to demonstrate pretext merely by showing that the report is false. *See Elrod*, 939 F.2d at 1469 (holding that such facts do not establish pretext); *see also Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989)(same). Instead, ***the plaintiff must establish pretext by pointing to evidence that suggests that the employer either did not rely on that report or that the employer did rely on the report but knew it was false.*** *Strickland*, 108 F. Supp. 2d at 1333. It is only where the decision maker relies on its own personal knowledge of the work rule violation that . . . mere evidence disputing the violation will be sufficient to establish pretext. *See id.* Relying on similar reasoning, the court in *Sweeney* determined that a plaintiff who disputed that she violated the work rule did not establish pretext where the decision maker relied on the report of a supervisor in determining that the plaintiff violated a work rule. *Sweeney*, 117 F. Supp. 2d at 1273.

*Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1346 (M.D. Ala. 2001).

Because the evidence indicates that Russell relied on employees' reports regarding plaintiff's conduct on May 17th, as well as other complaints and reports of plaintiff's attitude, the court finds that plaintiff must point to evidence from which a reasonable jury could find either that Russell did not rely on the reports of others regarding plaintiff's attitude or that she did rely on those reports knowing they were false. This, plaintiff has not done. Therefore, the court finds that she has not demonstrated that Russell's articulated reason for terminating plaintiff – plaintiff's attitude problems – is unworthy of credence.

27

### d. Racially Hostile Work Environment

Defendant contends that plaintiff's racial harassment claim is due to be dismissed because the acts of which plaintiff complains "do not constitute harassment, but merely exemplifies the ordinary tribulations of the workplace,' which the Supreme Court and [the Eleventh Circuit] have held do not constitute actionable [racial] harassment." (Def. Memo in Supp. of Mot. for Summ. J. at 13 (quoting *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000))(internal quotations omitted).) Plaintiff argues, "A multitude of seemingly minor events in isolation collectively have the impact of interfering with an employee's ability to do [her] job." (Pl. Mem. in Opp. to Mot. for Summ. J. at 13.) She contends that the following incidents of harassment are severe or pervasive enough to constitute actionable harassment:

1. She was replaced at the drive-thru window.

2. Her desk was taken away and she was not given a case drawer.

3. She was not given the opportunity to participate in training seminars.

4. She was given additional telephone lines to answer, but was criticized for spending too much time on the telephone.

5. She performed additional job duties that required her to be away from her desk, yet defendant criticized her for being away from her desk too often.

6. She was required to clean the vault.

7. Her key combination was taken away.

8. She was criticized for not being a team player and because she was not giving 100%.

9. She was paid less than similarly situated white employees.

10. Russell refused to give her an evaluation in 2002, which was the only way in which plaintiff would be eligible for a pay increase.

(Pl. Mem. in Opp. to Mot. for Summ. J. at 13-14.)  Plaintiff argues, "[The] multitude of seemingly minor events in isolation collectively have the impact of interfering with an employee's ability to do [her] job. Here, the actions of Russell, once she took over, not only interfered with [plaintiff] performing her job, they essentially eliminated [plaintiff's] ability to do her job, even before she was terminated." (*Id*. at 13.)

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  To establish a prima facie case of hostile work environment racial harassment, plaintiff must show:

> (1) that [she] belong to a protected group; (2) that [she has] been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [her race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id*.; *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc).

"Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile

work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Therefore, "[a]lthough we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a [racial] or [race]-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a 'general civility code.'" *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)(citing *Mendoza*, 195 F.3d at 1242,; Faragher, 524 U.S. at 788, 118 S. Ct. at 2283-84.)

"[A] [racially] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher* (citing *Harris* 510 U.S., at 21-22) The *Faragher* court stated:

> We directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . A recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)(internal citations and quotations omitted).   In other words, "the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment'" because of plaintiff's race. *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003) (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999)).

Defendant's decisions regarding plaintiff's work assignments, job duties, training, and pay were not severe or pervasive racial harassment such that plaintiff's work environment was abusive or hostile based on her race.   Nothing in the record indicates that these discrete employment decisions or work-performance criticisms were made in a discourteous, ridiculing, intimidating, or insulting manner.   *See DeNovellis v. Shalala*, 124 F.3d 298, 311 (1st Cir. 1997)("[T]he 'hostile' aspect of remaining in an undesirable job assignment is not akin to a pervasive environment claim; it is a discrete employment decision, however adverse it may be.").   Nothing in the record indicates that plaintiff was otherwise subjected to any overt racial animus or that she was treated discourteously.   Her complaint lies in the fact that she disagreed with defendant's employment decisions and/or criticisms, which she contends were made because of her race.   Nevertheless, she has not presented evidence sufficient to demonstrate that the decisions and criticisms were so "permeated with discriminatory intimidation, ridicule, and insult" that a reasonable person would have found the work environment hostile or abusive because of race.   *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Because the court finds that the alleged acts of racial harassment are not based on plaintiff's race nor are they sufficiently severe or pervasive to have created a racially hostile work environment, defendant's Motion for Summary Judgment as to plaintiff's hostile environment claim is due to be granted.

### e. Pay

Defendant did not present any evidence or argument in support of its Motion for Summary Judgment as to plaintiff's pay claim. Therefore, its Motion is due to be denied as to plaintiff's pay claim. However, as set forth above, plaintiff's claims for monetary damages are due to be dismissed, leaving only her claims for injunctive and declaratory relief, which the court is inclined to dismiss.

In her Amended Complaint, plaintiff alleges that defendant discriminated against her on the basis of her race and her color with regard to her pay. (Doc. 10 ¶ 22.) She asks the court to award her "back pay plus damages, interest, injunctive and declaratory judgment." (*Id.* ¶ 23.) Specifically, she asks the court for "a declaratory judgment that the employment policies, practices, procedure, conditions and customs of the Defendant [are] volatile [sic] of the rights of Plaintiff," and "a permanent injunction enjoining the Defendant . . . from continuing to violate Title VII . . . and 42 U.S.C. § 1981." (*Id.* at 7-8.)

Plaintiff no longer works for defendant and there is no indication that she is likely to reapply in the future. Therefore, she would not "benefit personally" from an injunction enjoining defendant from further discrimination. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984). Unless plaintiff would benefit personally from the

32

injunctive relief requested, such injunctive relief is "inappropriate" because it is "unnecessary to the 'just disposition of the action'." *Id.* (internal citations omitted).

Also, the court is disinclined to entertain a declaratory judgment action based on plaintiff's discriminatory pay claim.  Plaintiff cannot recover monetary damages based on alleged discriminatory pay, she does not work for defendant, and she has no expectation of reinstatement.  Therefore, the court is not inclined to expend its limited judicial resources determining whether defendant discriminated against plaintiff with regard to her pay when such judgment would be a Pyrrhic victory.

Nevertheless, the court will allow plaintiff the opportunity to demonstrate good cause why her non-monetary claims for relief based on her pay discrimination claim should not be dismissed sua sponte.  The court will enter a separate Show Cause Order contemporaneous with this Memorandum Opinion.

## 2. STATE CLAIMS

Plaintiff contends that defendant negligently and/or maliciously failed to adequately train, supervise, and/or it negligently retained Russell and other employees.  Defendant has moved for summary judgment as to all claims.  (Def. Memorandum in Supp. of Mot. for Summ. J. at 18-20.)  Plaintiff has not presented any argument in opposition to defendant's Motion for Summary Judgment as to her state-law claims.  Therefore, the court finds that plaintiff has abandoned these claims. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587,

599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).[11]  Defendant's Motion for Summary Judgment as to plaintiff's state-law claims is to be granted, and such claims are due to be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to all claims, except plaintiff's pay discrimination claim.  An order granting defendant's Motion for Partial Summary Judgment, (doc. 23), and granting in part and denying in part defendant's Motion for Summary Judgment, (doc. 26), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _27th_ day of September, 2004.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[11]The court notes that defendant would also be entitled to judgment on the merits for the reasons stated in Defendant's Brief in Support of its Motion for Summary Judgment.